UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

AMERICAN NATIONAL RED CROSS, a non-profit corporation created by an act of Congress,

    Plaintiff,

    v.

UNITED WAY CALIFORNIA CAPITAL REGION, a California corporation; VOLEN PROPERTIES 10, LLC, a California limited liability company; and DOES 1-10, inclusive,

    Defendants,
_____/

AND RELATED COUNTERCLAIMS.
_____/

NO. CIV. S-07-1236 WBS DAD

ORDER RE: AMENDED MOTION FOR SUMMARY JUDGMENT

----oo0oo----

        Plaintiff, the Sacramento-Sierra Chapter of the American National Red Cross ("Red Cross"), brought this action to resolve disputes arising from its lease of and alleged option to purchase an ownership interest in the property it leases from defendant Volen Properties 10, Inc. ("Volen"). Red Cross now moves for summary judgment to establish the validity of its

1

alleged option.

I.   Factual and Procedural Background

Beginning in 1988, Red Cross leased a 26,099 square-foot building that is located at 8928 Volunteer Lane in Sacramento, as well as a pro rata share of the property's common areas ("property"). (Van Dooren Decl. Ex A.) The twenty-year lease was considered a capital lease because Red Cross's lease payments were amortized to pay the amount of the mortgage on the property by the end of the lease term. (Anderson Dep. 58, 232; Blumenfeld Dep. 49:12-16; Wilcox Decl. Ex. I at 32-33.) As a result of this arrangement, Red Cross paid a higher rent than other tenants (Anderson Dep. 137:15-17), and the original lessor, O.K. and B, agreed to donate the property to Red Cross at the end of the twenty-year lease. (Van Dooren Decl. Ex B ("Agreement to Donate").)

O.K. and B later sold the property to California Center, which subsequently sold it to defendant United Way California Capital Region ("United Way") on April 7, 1994. (Id. Exs. C & D.) When California Center sold the property to United Way, the parties executed a Second Amendment, which terminated the Agreement to Donate and created, in Red Cross, an option to purchase the property for $1.00 on April 30, 2010. (Id. Ex. D.) The Second Amendment incorporated the terms of the Agreement to Donate as the terms for the sale if Red Cross exercised its option. (Id.) While United Way and Red Cross had a landlord-tenant relationship, both parties continued to treat Red Cross's lease as a capital lease and viewed Red Cross as having an "ownership" interest in the property. (Wilcox Decl. Ex. I at 32-

33; Anderson Dep. 27:7-13; Golding Dep. 54:10-15, 11:25-12:2.)

Beginning in approximately 1995, however, Red Cross experienced financial challenges and could no longer afford its rent. (Cottrell Dep. 154:8-13.) To avoid having to terminate its lease, Red Cross initiated discussions with United Way about the possibility of amending its lease. (Id. at 27-34.) After Karal Cottrell, a member of the Red Cross Board of Directors, initiated early communications with United Way, John Stroud, an Interim Chief Executive Officer for Red Cross, and James Anderson, the chief negotiator for United Way, primarily handled the negotiations. (Id. at 24:11-14, 155:16-21; Anderson Dep. 27:23, 46:1-3; Stroud Dep. 19:16-19, 24-8-19.) The organizations agreed on the main points, and then Red Cross and United Way's counsel began drafting the Third Amendment. (Ginter Dep. 31:8-14, 54:2-19.)

On approximately September 16, 1996,[1] Red Cross and United Way executed the Third Amendment, which reduced the scope of Red Cross's lease from the entire two-story building to only the first floor. (Van Dooren Decl. Ex. E at ¶ 2.1.) Based on its square footage, the first floor comprises exactly 48.87% of the building. (Id. Ex. E at Ex. B.) Red Cross's rent, as well as its tax, maintenance, and utilities expenses, were also reduced to 48.87% of their previous amounts. (Id. ¶¶ 2.2-2.3.)

The Third Amendment also granted Red Cross the right, until the earlier of either June 30, 2001, or United Way's sale

---

[1] The Third Amendment is dated July 1, 1996, but it appears that representatives for Red Cross and United Way did not sign it until September 16, 1996. (Id. at 44:25-45:2.)

of the property, to reinstate its original leasehold interest in the second floor. (Id. ¶¶ 3.1-3.2.) If, however, Red Cross did not reinstate its original leasehold interest within the allotted time, the Third Amendment provided that its option would automatically be reduced to an option to purchase a 48.87% ownership interest in the property. (Id. ¶ 3.5.) Because Red Cross did not reinstate its original leasehold interest, the Third Amendment automatically reduced, on July 1, 2001, Red Cross's option to purchase the entire property to an option to purchase only a 48.87% interest in the property for $1.00. (Id.)

The Third Amendment also provided that if United Way sold the property before Red Cross reinstated its original leasehold interest or June 30, 2001, Red Cross's lease would terminate and Red Cross would be entitled to a 48.87% share in the excess gain of the sale. (Id. ¶ 4.) The parties dispute the legal effect of the Third Amendment for a sale that occurred after June 30, 2001.

In June of 2007, Red Cross learned that United Way was negotiating with Volen about the sale of the property and representing to Volen that Red Cross no longer had an option to purchase an ownership interest in the property. (Wilcox Decl. ¶ 3.) In response, Red Cross filed this lawsuit on June 25, 2007, and, on July 9, 2007, sent a letter to Volen detailing Red Cross's position regarding its option. (Id. Ex. F.) On the same day, Red Cross recorded a Notice of Pendency of Action, alleging its right to purchase a 48.87% interest in the property on April 30, 2010 for $1.00.

United Way sold the property on September 14, 2007, to

4

APIP 220, L.L.C.,[2] which transferred it to Volen fourteen days later. (Pl.'s Req. for Judicial Notice in Supp. of Mot. for Summ. J. Exs. C, D.) Red Cross subsequently amended its complaint, naming Volen as a defendant in this action.

In its Second Amended Complaint, Red Cross alleges claims for 1) breach of contract against Volen--refusal to provide a short form memorandum of lease recognizing Red Cross's option; 2) breach of contract against United Way--refusal to provide a tentative parcel map for Red Cross's approval; 3) breach of contract against Volen--interference with quiet enjoyment of property; 4) breach of contract against Volen--excessive charges; 5) accounting against both defendants; 6) money had and received against Volen; and 7) declaratory relief with respect to its rights under the lease against both defendants.

While United Way filed a Counter-Complaint against Red Cross, the court granted Red Cross's special motion to strike United Way's counterclaims. (May 28, 2008 Order.) Red Cross has also filed a Counter-Complaint against United Way, and Volen has filed a Counter-Complaint against Red Cross requesting declaratory relief with respect to Volen's rights under Red Cross's lease.

Red Cross originally filed a motion for summary judgment on February 25, 2008; however, the court was forced to delay hearing Red Cross's motion due to the numerous evidentiary

---

[2] APIP 220, L.L.C. functioned solely as a 1031 exchange facilitator. Red Cross named it as a defendant in its original Complaint and First Amended Complaint, but did not name it as a defendant in its Second Amended Complaint.

5

objections Red Cross and Volen filed. (Apr. 10, 2008 Order.) Volen then sought a continuance pursuant to Federal Rule of Civil Procedure 56(f), which the court granted and, in doing so, permitted Red Cross to file the amended motion for summary judgment that is presently before the court. (May 23, 2008 Order.) In its pending motion, Red Cross moves for summary judgment with respect to its claim against Volen for breach of contract based on Volen's refusal to provide a "short form" memorandum of lease recognizing its option and its claim and Volen's counterclaim for declaratory relief, solely as they relate to the option.

II. Discussion

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Alternatively, the moving party can demonstrate that the non-moving party cannot produce evidence to support an essential element upon which it will bear the burden of proof at trial.

1 Id.

2 Once the moving party meets its initial burden, the non-moving party "may not rely merely on allegations or denials in its own pleading," but must go beyond the pleadings and, "by affidavits or as otherwise provided in [Rule 56,] set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); Celotex Corp., 477 U.S. at 324; Valandingham v. Bojorquez, 866 F.2d 1135, 1137 (9th Cir. 1989).  In its inquiry, the court must view any inferences drawn from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The court also may not engage in credibility determinations or weigh the evidence, for these are jury functions.  Anderson, 477 U.S. at 255.

15 "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to . . . 'the mutual intention of the parties at the time the contract is formed . . . .'"  Waller v. Truck Ins. Exch., Inc., 11 Cal. 4th 1, 18 (1995) (quoting Cal. Civ. Code §§ 1636, 1639).  On a motion for summary judgment, a court may properly interpret a contract as a matter of law only if the meaning of the contract is unambiguous.  Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 990 (9th Cir. 2006) (citation omitted).  Language in a contract is ambiguous if it "is reasonably susceptible of more than one application to material facts."  Dore v. Arnold Worldwide, Inc., 39 Cal. 4th 384, 391 (2006); see also Maffei v. N. Ins. Co. of N.Y., 12 F.3d 892, 898 (9th Cir. 1993) (citation omitted) ("Under California law, a

party may present extrinsic evidence to show that a facially unambiguous contract is susceptible of another interpretation.").

When determining whether a contract is reasonably susceptible to a proffered interpretation, the court must consider the contract as a whole and the context and circumstances under which the parties executed it. See Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."); Bank of the W. v. Superior Court, 2 Cal. 4th 1254, 1265 (1992) ("'[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.'") (citations omitted); see also Comedy Club, Inc. v. Improv W. Assocs., 514 F.3d 833, 842 (9th Cir. 2007) ("'California law provides that one phrase of a contract should not be interpreted so as to render another phrase of the contract meaningless.'") (citation omitted).

If the court determines that the contract language is ambiguous (i.e., reasonably susceptible to more than one interpretation), neither the parol evidence rule nor the statute of frauds precludes the court from considering extrinsic evidence to ascertain the parties' true intent. See Casa Herrera, Inc. v. Beydoun, 32 Cal. 4th 336, 343 (2004) ("The parol evidence rule . . . 'generally prohibits the introduction of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms of an integrated written instrument.' . . . The rule does not, however, prohibit the introduction of extrinsic evidence 'to explain the meaning of a written contract . . . [if] the meaning

urged is one to which the written contract terms are reasonably susceptible.'") (citations omitted) (alteration and third omission in original); Sterling v. Taylor, 40 Cal. 4th 757, 762 (2007) ("Extrinsic evidence has long been held admissible to clarify the terms of a memorandum for purposes of the statute of frauds. Statements to the contrary appear in some cases, but we disapprove them.").[3]

If the non-moving party shows that a contract is reasonably susceptible to an interpretation that conflicts with the moving party's interpretation, summary judgment is ordinarily "improper because differing views of intent of parties will raise genuine issues of material fact." Maffei, 12 F.3d at 898 (citation omitted). Summary judgment is also inappropriate if interpreting the contract "turns upon the credibility of conflicting extrinsic evidence, or if 'construing the evidence in the nonmovant's favor, the ambiguity can be resolved consistent with the nonmovant's position.'" Miller, 454 F.3d at 990 (citation omitted).

---

[3] "[A] memorandum is sufficient under the statute of frauds if extrinsic evidence clarifies the terms with reasonable certainty[, ] the evidence as a whole demonstrates that the parties intended to be bound," and the memorandum includes the essential terms of the parties' agreement. Sterling, 40 Cal. 4th at 771. Contrary to Red Cross's position--which relies on the ambiguity in the Third Amendment to suggest the absence of an essential term--the Third Amendment includes the essential terms of the parties' agreement. Cf. id. at 767 ("Because the memorandum itself must include the essential contractual terms, it is clear that extrinsic evidence cannot *supply* those required terms. It can, however, be used to *explain* essential terms that were understood by the parties but would otherwise be unintelligible to others."); see also id. at 771 ("Conflicts in the extrinsic evidence are for the trier of fact to resolve, but whether the evidence meets the standard of reasonable certainty is a question of law for the court.").

The interpretation the parties dispute is whether, under the terms of the Third Amendment, Red Cross's option to purchase a 48.87% interest in the property on April 30, 2010, survived United Way's sale of the property to Volen. The parties' competing interpretations revolve around the meaning of paragraph four of the Third Amendment:

> 4. <u>Sale of Building</u>. If Lessor enters into an agreement to sell the Building before the earlier of (i) the date Lessee reinstates Lessee's original leasehold interest in the second floor of the Building pursuant to Section 3, above, or (ii) June 30, 2001, the Lease shall automatically terminate as of the close of escrow and Lessee shall have four (4) months after the close of escrow to vacate the Premises. **In the event of any sale of the Building by Lessor**, (a) Lessor shall bear any and all loss on sale, (b) Lessor shall receive all gain on sale up to an amount equal to Out-of-Pocket Expenses and (c) Lessor and Lessee shall share any gain on sale, over and above the amount described in subparagraph (b), above, in the following percentages: 51.13 percent and 48.87 percent, respectively.

(Van Dooren Decl. Ex. E at ¶ 4 (second emphasis added).) More precisely, the parties dispute whether the 48.87% share in any excess gain provided for in the second sentence of paragraph four applies to United Way's sale of the property on September 14, 2007.

Red Cross contends that the second sentence would have applied only if United Way had sold the property before June 30, 2001, because the second sentence is controlled by, and applies only to, the pre-June 30, 2001 sale contemplated in the first sentence of paragraph four. As the sale in this case occurred after June 30, 2001, Red Cross concludes that paragraph four's provision for Red Cross to receive a 48.87% share in the excess gain is inapplicable and that Volen purchased the property subject to Red Cross's option.

On the other hand, Volen argues that the second sentence of paragraph four exists independently of the first sentence of that paragraph and therefore applies to "any" sale of the property, regardless of whether it occurred before or after June 30, 2001. Under Volen's interpretation, United Way's sale of the property in September of 2007 entitled Red Cross to a 48.87% share in any excess gain in lieu of retaining its option, thereby rendering Volen's purchase of the property unencumbered by Red Cross's option.[4]

When the second sentence of paragraph four is read in isolation, the unqualified use of the word "any" clearly supports Volen's position that the distribution of excess gain would apply to "any" sale. In its prior Order addressing Volen's motions to expunge the lis pendens and dismiss, however, this court reasoned that Red Cross's interpretation was more likely correct because it was more consistent with other provisions in the Third Amendment. Am. Nat'l Red Cross v. United Way Cal. Capital Region, No. 07-1236, 2007 WL 4522967, at *7 (E.D. Cal. Dec. 19, 2007) (quoting Cal. Civ. Code § 1641) (citing Bank of the W., 2 Cal. 4th at 1265; Southgate Rec. & Park Dist. v. Cal. Ass'n for Park & Rec. Ins., 106 Cal. App. 4th 293, 298 (2002)). After concluding discovery and obtaining new counsel, Volen now offers extrinsic evidence and new arguments to support its interpretation.

---

[4] Although Red Cross has yet to adopt the interpretation, it contends that, if the second sentence is interpreted to apply to "any" sale regardless of when it occurred, Red Cross would be entitled to retain its option and receive a share in the excess gain because the second sentence does not provide for Red Cross's option to terminate.

1          Most significantly, Volen contends that the parties
2 intended for "any" sale of the property to terminate Red Cross's
3 option by giving Red Cross a share in the excess gain <u>in lieu of</u>,
4 and potentially in equal value to, its option to purchase the
5 property.  Specifically, United Way's chief negotiator explained
6 that the parties intended for a sale after June 30, 2001, to
7 terminate Red Cross's option because taking over the second floor
8 required United Way to incur a substantial and potentially risky
9 financial burden; thus it needed the ability to sell the property
10 at any time without the undesirable encumbrance of Red Cross's
11 option.  (Anderson Dep. 79:15-25, 83:17-25, 207:15-20.)  United
12 Way's ability to maintain total control to sell the building,
13 according to Anderson, was a trade-off for the risk it incurred
14 to help Red Cross.
15          Scenarios the parties considered when drafting the
16 Third Amendment tend to support Volen's interpretation because
17 they reveal that, prior to executing the Third Amendment, Red
18 Cross and United Way contemplated that Red Cross would receive
19 compensation in exchange for its option.  (<u>See</u> Wilcox Decl. Ex. J
20 at 1 (explaining that, under one scenario, Red Cross's "equity in
21 the building would be equal to the amount of space on the first
22 floor"); <u>id.</u> Ex. J at 2 (allowing United Way to sell the building
23 "now owned" by Red Cross so long as it made a "'good faith'
24 effort to provide equivalent 'equity' interest in the remaining
25 building or in another mutually agreed on facility").)  Based on
26 the capital lease Red Cross had, and the parties' resulting
27 belief that Red Cross essentially had an "ownership" or "equity"
28 interest in the first floor (Anderson Dep. 27:4-13; Wilcox Decl.

Ex. J at 17; Golding Dep. 54:10-15, 11:25-12:2), it is not unreasonable to conclude that the parties intended Red Cross's proportionate share in the excess gain to adequately compensate it for what amounted to the sale of its option.

Under the direction of new counsel, Volen also relies on paragraph 3.1 to address the court's concern with the potential inconsistency between paragraph 3.5 and the second sentence of paragraph four if Red Cross had reinstated its original leasehold interest.  See Am. Nat'l Red Cross, 2007 WL 4522967, at *7 (explaining the potential inconsistency). According to Volen, the phrase "as if unamended by this Third Amendment" in paragraph 3.1 eliminates any inconsistent result because it establishes that Red Cross's election to reinstate its original leasehold interest would have automatically eliminated the Third Amendment.  (Van Dooren Decl. Ex. E at ¶ 3.1.)  The limited scope of the Third Amendment, combined with the fact that the parties would have essentially returned to their pre-Third Amendment positions if Red Cross had reinstated its original leasehold interest (Golding Dep. 55:8-14; Bolton Dep. 6-20), render it possible that the parties intended to abandon the Third Amendment if Red Cross reinstated its original leasehold interest.

As the parties' briefs illustrate, each side proffers explanations why its interpretation should prevail and the other side's interpretation must fail.  When judged on a motion for summary judgment, however, each side's argument that its interpretation is superior is feasible and each side's argument that the other side's position is misguided is equally feasible.

13

Ultimately, the evidence both parties submit in support of their respective interpretations crystalizes the court's inability to conclude that paragraph four is unambiguous. The deposition testimony in this case reveals that the individuals involved in 1996 remember few, if any, details about the creation of the Third Amendment,[5] that the chief negotiators for Red Cross and United Way were not directly involved in the drafting of the Third Amendment and did not memorialize the terms to which they agreed,[6] and that the representatives who signed the Third Amendment do not remember if they even read the document.[7] Added

---

[5] (See, e.g., Anderson Dep. 211:8-16 (indicating that Anderson does not remember why language was changed from a draft that gave United Way the explicit right to sell to the final version of the Third Amendment); Ginter Dep. 81:10-14 ("I don't have a specific recollection of the intent [of language in the Third Amendment I helped draft], other than I would say that I think it was the intent to have the option available even if the second floor was not required."); id. at 83:21-22 ("I just don't remember discussing specifically paragraph 4.").)

[6] (See, e.g., Anderson Dep. 123:10-12 ("I'm not going to be able to tell you why language changed from one draft to another or the recollection."); Cottrell Dep. 80:8-11, 81:7-8, 111:9-15, 126:15-19 (explaining that, despite direct involvement in the negotiations leading to the Third Amendment, Cottrell was "not involved in any of the dialogue or the drafting of the legalese involved in putting [the Third Amendment] together," never saw drafts of it before this lawsuit, and is not sure the language in it is clear); Stroud Dep. 23:7-14, 24:16-19 (explaining that, while he was involved with the negotiations, he left it to others to prepare the specific terms of the Third Amendment and does not recall whether he saw the document); Anderson Dep. 104:20-21 ("[T]he lawyers weren't intensely involved on developing the purpose, the intent of the [Third Amendment].").)

[7] (See, e.g., Golding Dep. 21:1-15, 40:16-24 (explaining that she does not know what the parities' intent was when entering into the Third Amendment and does not recall reading or signing the Third Amendment, which she signed on behalf of Red Cross); Owens Steward Dep. 42:2-13 (indicating that she does not recall the Third Amendment, which she signed on behalf of United Way).)

14

to this imprecise testimony is the fact that individuals involved with United Way and Red Cross have, at some point, each adhered to the interpretation the other entity advances.[8]  In the final analysis, because the Third Amendment is ambiguous and the conflicting extrinsic evidence raises questions of fact that cannot be resolved on summary judgment, the court must deny Red Cross's amended motion for summary judgment.

As counsels' responses at oral argument illustrate, it appears that neither party has given sufficient consideration to how this case should ultimately be resolved.  It is clear that the interpretation of a contract is "solely a judicial function . . . unless the interpretation turns upon the credibility of extrinsic evidence." U.S. Leasing Corp. v. duPont, 69 Cal. 2d 275, 284 (1968) (citations and internal quotations omitted); see also Sterling v. Taylor, 40 Cal. 4th 757, 771 (2007) ("Conflicts in the extrinsic evidence are for the trier of fact to resolve, but whether the evidence meets the standard of reasonable

---

[8] (See, e.g., Wilcox Decl. Ex. G (referencing an offer Volen allegedly made to purchase Red Cross's option for $1.2 million); id. Ex. K at 4 ("Thus, we [United Way] have a tenant who has a valid lease and a valid $1 purchase option of a 48.87% interest in the 8928 building on April 30, 2010.  Any sale of the 8929 building would be subject to this lease and purchase option."); Stroud Dep. 55:4-10, 58:1-8, 86:17-87:11 (testifying that the only "limitations" he recalled on United Way's right to sell the building was "[c]oncurrence with the Red Cross" and that the last sentence of paragraph four "reflected what [he] and United Way's principal negotiator had talked about, that in the event of any sale of the building by lessor, proceeds would be distributed as stated in that sentence"); Cottrell Dep. 86:16-23 (consenting to an explanation that the parties agreed that, "if the building was sold after June 30th, 2001, Red Cross would continue to own -- have an equity interest of 48.87 percent in the building and that if the building were sold after June 30th, 2001, Red Cross would receive 48.87 percent of the net sales proceeds . . .").)

certainty is a question of law for the court.") (citation omitted).

Concluding that a jury may have to resolve the conflicting extrinsic evidence, however, far from resolves how the court can meaningfully vest the jury with its role in the resolution of this case, especially when the interpretation of a contract remains a question of law. Compare Med. Operations Mgmt., Inc. v. Nat'l Health Labs., Inc., 176 Cal. App. 3d 886, 892 n.4 (1986) (suggesting that "the trial court [should] require the jury to make special findings on the disputed issues and then base its interpretation of the contract on those findings"), with Horsemen's Benevolent & Protective Ass'n v. Valley Racing Ass'n, 4 Cal. App. 4th 1538, 1562 (1992) (holding that the trial "court did not err in submitting the issue of interpretation of [an ambiguous] term [] to the jury"). In raising this issue now, the court hopes that the parties will evaluate whether this case should proceed before a jury and, if it does, be able to address the serious questions that will arise when the court determines how to instruct the jury and develop a verdict form that adequately addresses the niceties of contract interpretation.

IT IS THEREFORE ORDERED that Red Cross's amended motion for summary judgment be, and the same hereby is, DENIED. The parties may file amended Pretrial Statements in light of this Order by no later than November 10, 2008.

DATED: November 3, 2008

*[signature]*
WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE